EXHIBIT 2

## DEVELOPMENT SERVICES AGREEMENT

THIS DEVELOPMENT AGREEMENT (the "**Agreement**"), dated as of this 22nd day of November, 2021, but effective on the date construction commences, by and between 5703 9[th] LLC a District of Columbia limited liability company ("**Owner**"), and 5703 MANAGER, LLC , a District of Columbia limited liability company ("**Developer**").

## RECITALS

A. The Owner intends to renovate and construct a 2 – unit condominium at 5703 9th St NW, Washington, District of Columbia (the "**Property**").

B. The Owner wishes to enter into this Agreement with Developer pursuant to which Developer shall develop the Property as a condominium (all of the foregoing, the "**Project**").

C. The Owner is governed by the Operating Agreement of 5703 9th LLC of even date herewith (the "**Owner LLC Agreement**") .

D. Capitalized terms used herein and not otherwise defined shall have the meaning set forth for the same in the Owner LLC Agreement.

NOW, THEREFORE, in consideration of the mutual promises and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## DEFINITIONS

"Approval" means written consent, which may be given or withheld in the relevant parties' sole discretion, after first having received written notice pursuant to Section 19 below, prior to taking any action, which notice includes the details of the consent being sought.

"Architect" means Make It Stack, LLC, the licensed architect retained on behalf of Owner as the primary architect for the Project.

"Contractors" mean the General Contractor, subcontractors and trade contractors.

"Consultants" mean architects, engineers, selling brokers and other consultants hired by the Developer as provided herein.

"Construction Contracts" mean all contracts and purchase orders with the Contractors, including but not limited to the General Contract, and the suppliers necessary to cause the construction of the Project.

"Construction Lender" means Washington Capital Partners.

"Construction Loan" means the loan made by Washington Capital Partners to the Owner in the amount of $1,050,000 to finance the Project, and any amendment, modification or refinancing thereof.

"Design Agreements" means all contracts with the Architect and other consultants as necessary to cause production of the Final Plans and Specifications and Construction Contracts and administration of construction and related activities.

"Entitlements" means all environmental, zoning, land use and site plan approvals and other permits and licenses required to complete and operate the Project as designed.

"Final Construction Schedule" means the final time line for full development of the Project prepared by General Contractor and CM, Approved by Owner, attached to the General Contract, as amended from time to time with the Approval of Owner and subject to a Force Majeure Event.

"Final Plans and Specifications" means the plans and specifications for construction of the Project completed by Make it Stack, LLC dated TBD.

"Final Project Budget" means the final project budget for completion of the Project in accordance with the Final Plans and Specifications and incorporating the General Contract which final project budget is attached hereto as **Exhibit A**, and shall not include any change orders costing in excess of $10,000.00 unless otherwise Approved by Owner as provided in this Agreement and the Owner LLC Agreement.

"Force Majeure Event" means an event or circumstance beyond the reasonable control of the Developer for their respective duties under this Agreement, including (a) riots, (b) fire, (c) explosions, (d) embargoes, (e) acts of war, (f) acts of terrorism or civil disturbance, (g) acts of a public enemy, (h) strikes, lockouts or other labor actions, (i) acts of God, (j) actions or inactions by governmental authorities which are not caused due to fault or negligence of the Developer in connection with their respective duties under this Agreement, (k) epidemics and (l) quarantines.

"General Contractor" means Avamere Construction LLC.

"General Contract" means general contract to be entered into between the Owner and the General Contractor for the Work dated TBD.

"Hard Costs" means the costs shown in the Final Project Budget for all Work to be performed to construct and complete the Project, including the Work under the General Contract.

"Hard Cost Contingency" means the amount shown in the line item so labeled in the Final Project Budget.

"Hazardous Materials" means any flammable, explosive, radioactive materials, hazardous wastes or materials, toxic wastes or materials or other similar substances, petroleum products or derivatives or any substance subject to regulation.

"Improvements" means a residential development consisting of (a) one 3 story approximately 6,000 building comprised of 2 separate condominium units and (b) all systems for such type of development.

"Law" means all laws, ordinances, and codes pertaining to the Project, including any determinations of all Federal, state or municipal authorities having jurisdiction over the Project.

"Project Agreements" mean any agreements, including all amendments thereto, for design and engineering, including architectural, construction (including the General Contract), testing, or consulting services for the Project, and any contracts or other agreements, for the furnishing of any supplies, materials, machinery, services, or equipment required for the Project.

"Project Costs" means all actual costs for the acquisition of the Property, construction of the Improvements in accordance with the Final Plans and Specifications of the Project, including all Hard Costs and Soft Costs actually incurred. Project Costs shall not include the cost of any change orders initiated by Developer and not Approved by Owner as required by this Agreement and the Owner LLC Agreement.

"Soft Costs" means all costs in the Final Project Budget that are not Hard Costs, such as architecture design and engineering fees, development management fees, marketing, development reimbursables, estimated cost of debt, leasing fees, financing costs and fees, real estate taxes, legal fees and other costs to the extent set forth in the Final Project Budget.

"Soft Cost Contingency" means the amount shown in the line item so labeled in the Final Project Budget.

"Work" means all construction and other activities required under the Construction Contracts, including all labor, materials, equipment and other services to be furnished thereunder to complete the Improvements in accordance with the Final Plans and Specifications, but shall not include in the case of retail and office tenants, tenant improvements required by their Leases.

1. <u>Services of Developer</u>. Developer shall, subject to the general direction and policy set by the Owner, the provisions of this Agreement, the provisions of the Owner LLC Agreement, as applicable, subject to Force Majeure Events, provide all administrative and management services for all aspects of the construction of the Project, as the same are necessary for the successful and substantial completion of the Project and any other work required by the Owner in connection with units. Developer agrees, at all times, to exercise good faith and to act in the best interests of the Project and the Owner throughout the term of this Agreement. Developer's standard of performance under this Agreement shall be that of a sophisticated and experienced project development and construction manager with respect to first-class, high quality projects comparable to the Project in the Washington D.C. metropolitan area. Developer shall perform its services set forth in this Agreement on behalf of the Owner in accordance with the applicable Laws (and shall use best efforts to avoid any penalty to which the Owner may be subject by reason of noncompliance with all Laws) and in accordance with and subject to the Final Project Budget, the Final Construction Schedule and the Final Plans and Specifications for the Project.

In addition to the foregoing, the services to be provided by Developer shall include the following:

(i)    Keeping the Owner informed regarding material matters related to the Improvements and the Project, including notifying the Owner promptly after the occurrence of any Major Event (as defined in the Owner LLC Agreement) and any material Property-related matter such as the filing of liens, the discovery of significant defects, and accidents and other emergencies;

(ii)    Deliver the Design Agreements to Owner for review, Approval and execution, and coordinate, administer and perform such contracts and agreement on behalf of the Owner;

(iii)    OMMITTED;

(iv)    Manage, monitor and oversee the construction of the Project, including all Contractors, design professionals and other parties with whom the Owner has signed a contract, and assure that such Contractors, design professionals and other parties do not charge extras or submit change orders that would increase the cost of the work as set forth in the subject contracts, including but not limited to, the General Contract, and that contract price for all such contracts comply with the Final Project Budget;

(v)    Coordinate and cooperate with design and sales representation and otherwise facilitate the timely completion of the Project and any other work required by the Owner in connection with the sale of the condo units;

(vi)    Review with the Owner and obtain the Owner's Approval of (x) any changes in scope of the Project that increase the cost of the Project by an amount of $10,000 or more and (y) all changes to the Final Plans and Specifications understanding that the Final Project Budget is a major control for the Project;

(vii)    Review with Owner and obtain Owner's Approval of all changes to the Construction Contracts and Design Agreements, except that the any change that does not increase the cost of construction by more than $10,000 does not need approval from the Owner.

Notwithstanding anything to the contrary contained above, unless (a) a budget revision is sent to Owner, (b) the change to any Construction Contract or Design Agreement does not cause a material change in the scope of work as set forth in the Final Plans and Specifications, a material change in the overall quality or design of the Project, the quality of the materials, methods and equipment used in constructing the Improvements, (c) is approved by all applicable governmental authorities, (d) does not cause the cost of all the Work to exceed the cost therefor including the Hard Cost Contingency and Soft Cost Contingency contained in the Final Project Budget, (e) is not projected to extend the schedule of completion of the applicable Work beyond the completion date for such Work as shown in the Final Construction Schedule, and (f) Owner are provided prior written notice of all change orders in excess of $10,000.00, Owner's Approval is required to make any change in the Construction Contracts and Design Agreements.

(viii)    Coordinate and monitor (x) the application for and procurement of Entitlements, (y) the application for governmental permits and approvals required for the construction of the Project and (z) compliance with the terms and conditions contained in any such governmental permit or approval, in any insurance policy required under this Agreement and affecting or covering the Project or in any surety bond obtained by the General Contractor or any other Contractor in connection with the Project;

(ix)    Coordinate and monitor efforts by the Architect to comply with all applicable federal, state, county and local laws, statutes, rules regulations, codes and ordinances;

(x)    Coordinate, administer and implement (x) the application and approval process in connection with the issuance of building permits, partial building permits, and temporary or final certificates of occupancy and (y) the arranging of any periodic inspections required by governmental officials and/or the Owner's and Construction Lender's inspectors for the Project and actually obtain all required permits and final certificates of occupancy;

(xi)    Identify, analyze and provide recommendations to the Owner with respect to alternative courses of action for unforeseen conditions, such as material shortages, work stoppages and/or accidents or casualties, as they occur;

(xii)    Review payment applications and supporting documentation submitted by the General Contractor and any others performing work, services or furnishing materials for the Project, and deliver copies of all such applications and supporting documentation to Owner and the Architect, obtain Certificates for Payment from the Architect and present all to Owner and the Owner for review and Approval;

(xiii)    Process monthly draw requests for the Project after first obtaining Approval from Owner pursuant to Section 8 below;

(xiv)    Cause the preparation of all required punch lists for finalizing the Work, coordinate the activities of Contractors to facilitate the satisfactory completion of all the Work (including procurement of equipment manuals, warranties and guaranties for the equipment installed in the Project) and coordinate the waiver and release of all lien rights;

(xv)    Monitor and, in addition, assist the Architect in monitoring performance of the Work for compliance with the Final Plans and Specifications;

(xvi)    Advise Owner of any delays known or anticipated in meeting the Final Construction Schedule and of the actual dates on which the various stages of construction as indicated on the Final Construction Schedule are started and completed;

(xvii)    Prepare monthly progress reports for the Owner which shall include revisions to the Final Construction Schedule, if any, identifying performance against the Final Construction Schedule, actual versus estimated percentage completion for each component of the Project and any change in the Final Construction Schedule which the General Contractor is requesting;

(xviii)  Hold weekly meetings or calls with Owner to discuss the progress of construction of the Project;

(xix)   Hold weekly job meetings with the General Contractor (and other Contractors on an as-needed basis) or more frequently as otherwise reasonably necessary or requested by Owner during the construction phase of the Project, and with Owner and the Architect to review the progress of construction toward completion of the Project;

(xx)   Coordinate and administer the submission of applications to, and negotiations with, utility companies and municipal and governmental authorities for agreements relating to the installation of utility and other services to the Project;

(xxi)   Assist Contractors in their efforts to arrange for performance and/or payment bonds with respect to any part of the Work to the extent such bonds are required by the Construction Contracts, verify that such bonds have been obtained in a timely manner and deliver copies such performance and payment bonds to Owner prior to the start of the work by each Contractor that is required to delivered such bonds;

(xxii)   Verify that the Architect, other Consultants, the General Contractor and other Contractors are covered by liability insurance and worker's compensation insurance in amounts and coverages as required by their contracts or otherwise satisfactory to the Owner , with waivers of subrogation and contractual indemnification coverages satisfactory to the Owner ;

(xxiii)  Retain or hire all necessary third parties (including, by way of example and not by way of limitation, contractors, engineers, surveyors, architects, accountants, attorneys, consultants and other qualified personnel) with the Approval of Owner in order to accomplish the duties required by Developer hereunder;

(xxiv)  In the event of an emergency at the Project, take any action in good faith believed by Developer to be required under the circumstances to protect the Project;

(xxv)   Effect, institute and supervise all Work, including interior and exterior demolition, mechanical systems, plumbing systems, building construction, landscaping, signage and sitework, all in accordance with the Final Plans and Specifications, Final Project Budget and Final Construction Schedule;

(xxvi)  Establish an on-site organization, lines of authority and communication;

(xxvii) Perform all other obligations provided elsewhere in this Agreement to be performed by Developer or otherwise necessary or appropriate to carry out its duties hereunder;

(xxviii)Effect, institute and supervise removal or abatement of any Hazardous Materials on the Property and in doing so, hire and oversee the Owner and Owner approved reputable environmental consultants and contractors in the proper removal or abatement of the same, all in accordance with a remediation plan approved by the Owner  and in accordance with the Law; and

(xxix)   Coordinate, manage, and oversee the successful marketing and sale of the condo units, including negotiating all sales contracts and scheduling all closings on units; providing punchlist walks with General Contractor and organizing warranty related items for new condo unit purchasers;

(xxx)   Maintain, during the term of this Agreement and for a period of three (3) years thereafter, and giving the Owner, Owner and its representatives access to, business and accounting records relating to the Project and the Developer's services.

All contracts with third parties for the benefit of the Project shall be signed by the Owner after Approval by the Owner .

2. <u>Limitations and Restrictions on Developer</u>.   Notwithstanding any of the provisions of this Agreement to the contrary, and in addition to other limitations and restrictions included in this Agreement, neither Developer nor any of its contractors, subcontractors, agents or employees shall take any of the following actions unless and until the same has been Approved by the Owner :

(i)   Initiate any zoning or other Entitlement process not consist with the Final Plans and Specifications;

(ii)   Approve (A) any modifications to the contracts with the Architect, Consultants, or General Contractor that increase the cost of such contracts by more than $10,000.00 or (B) any time extensions or waivers in connection therewith or in connection with any other Project Agreement;

(iii)   Make or approve any change in the construction of the Project or in the Final Plans and Specifications previously Approved by Owner, that would materially affect the design, appearance or quality of the Project;

(iv)   Make any expenditure or incur any obligation by or on behalf of Owner or the Project, except for expenditures made and obligations incurred pursuant to and specifically set forth in the Final Project Budget;

(v)   Make any expenditure or incur any obligation that exceeds any line item in the Final Project Budget;

(vi)   Expend more than what Developer in good faith believes to be the fair and reasonable market value at the time and place of contracting for any goods purchased or leased or services engaged on behalf of Owner or otherwise in connection with the Project; or

(vii)   Take any other action that requires approval of the members of Owner pursuant to the terms of the Owner LLC Agreement.

3. <u>Term</u>. Subject to earlier termination as provided herein or a Force Majeure Event, the term of this Agreement shall commence on the commencement of construction, and shall continue until the date that is the Project is substantially completed, the initial tenant under the

Lease has accepted its premises, and all punch list items and any other duties of the Owner pursuant to the initial Lease have been substantially completed.

4.    Project Budget: Cost Overruns.  Developer will supervise construction of the Project to assure that the cost of the Work performed does not exceed the amount allocated to that expense category in the Final Project Budget and Developer shall be required to obtain Approval from the Owner for any expenditure that will be allocated as a contingency expense under the Final Project Budget. Any changes to the Final Project Budget costing in excess of $10,000.00 shall require the Approval of the Owner . To the extent there are Cost Overruns, they shall be paid as required by the Owner LLC Agreement unless such Cost Overruns are as a result of the Developer's gross negligence, willful misconduct or failure to comply with its obligations under the terms of this Agreement.

5.    Employees.  Developer shall select, employ, pay, supervise and discharge all employees, independent contractors and personal necessary for the performance of its duties as required pursuant to the terms of this Agreement, all at the sole cost and expense of Developer.

6.    Payment of Development Fee.  The Owner shall pay Developer a "Development Fee" in the aggregate amount of $250,000 (the "Developer Fees"), payable as provided in this Section 6, payable each month, commencing in the month in which the initial draw request is made to Construction Lender. The first draw under the Construction Loan shall include payment of all monthly installments due and owing from the date of commencement of construction through the date of the first draw and the remaining monthly installment payments will be made concurrently with the payment of each subsequent monthly draw, provided that the timing of any payment shall be subject to requirements of Construction Lender.

7.    Bank Accounts.  Owner and Developer shall establish an interest bearing bank account with Eagle Bank  (the "Development Account") for the Project, which shall have both Developer and Owner as signatories to the Development Account. The purposes of the Development Account will be to receive and disburse funds in connection with the draws for payment of Project costs as required by this Agreement, the Owner LLC Agreement and as contemplated in Section 8 below and the Final Project Budget.

8.    Draw Process.

(i)    Developer shall be responsible for reviewing all requests for payment by the Contractors, Consultants, and any other third party requesting payment in connection with the Project for Project Costs and for coordinating all draws for payment of Project Costs. Draws shall be made no more or less often than monthly unless otherwise required by the Construction Lender. Funds requested under each draw shall be used solely to pay for costs related to the Project that are consistent with the terms of this Agreement and the Final Project Budget.

(ii)    Developer shall submit each draw request to Owner, Owner shall review the draw request and contact Developer as soon as reasonably practicable in the event Owner has any questions regarding the draw request or disputes any of the items for which payment is requested. The draw request shall not be submitted to the Construction Lender until approved by Owner.

(iii)    Payments.  Developer shall check and verify all bills received for services, work and supplies ordered in connection with the Project and pay or cause to be paid from the Development Account all such bills that are included in draw requests.  If such bills relate to materials supplied or work performed in connection with the Project, Developer shall obtain all necessary lien waivers evidencing payment of such obligations in advance of paying any such bills.

9.    Independent Contractor.  The relationship between the Owner and Developer shall be that of independent contractor, and Developer and Owner are not joint venturers or partners.  The Developer, and not the Owner, is the employer of his employees, and none of their officers, agents or employees shall, as a consequence of this Agreement, be deemed to be entitled to participate in any plans, arrangements or distributions of the Owner pertaining to or in connection with any health, pension, bonus or similar benefits for any employees.

10.    Developer's Insurance.  Developer shall maintain throughout the Term, at his respective sole cost, the following insurance written by insurance companies, and on forms, acceptable to Owner:

(i)    Workers Compensation.  Workers Compensation as required by law.

(ii)    Employers' Liability Insurance.  The employers' liability, and if necessary commercial umbrella, limits shall not be less than One Million Dollars ($1,000,000) each accident, One Million Dollars ($1,000,000) disease policy limit, and One Million Dollars ($1,000,000) disease for each employee.

(iii)    Commercial General Liability.  Commercial general liability insurance, and if necessary commercial umbrella insurance with a per occurrence limit of not less than Two Million Dollars ($2,000,000) with a Two Million Dollars ($2,000,000) annual aggregate. Coverage must include bodily injury and property damage, products completed operations and blanket contractual liability including indemnity clauses contained in this Agreement.

(iv)    Business Auto Liability Insurance.  Developer shall maintain business auto liability and, if necessary, commercial umbrella liability insurance with a limit of not less than One Million Dollars ($1,000,000) for each accident.  Such insurance shall cover liability arising out of any auto (including owned, hired and non-owned autos).

(v)    Professional Liability (Project Manager E&O).  Developer shall maintain project manager errors & omissions insurance covering any breach of a professional duty required by this Agreement with a limit of not less than Two Million Dollars ($2,000,000.)

Developer shall cause the General Contractor and any other Contractors, including, without limitation, subcontractors to obtain and maintain in full force and effect all insurance required by and otherwise to comply with the terms of their respective contracts including compliance with the requirements to provide evidence of insurance required under their respective contracts.

Developer shall provide Owner with certificates of insurance or other satisfactory documentation which evidences that all insurance required under this Agreement is in full force

and effect at all times.  Developer shall name the Owner, and his affiliates, and their respective officers, directors, partners, members and employees as additional insureds under their commercial general liability policy required to be obtained hereunder, on a primary and non-contributory basis, and must be endorsed to provide that thirty (30) days' advance written notice of cancellation or material change will be given to all named additional insureds.  All insurance required to be carried by the Developer, any contractor or subcontractor shall be written with companies having a rating in the Best's key Rating Guide of A: VII or better, which companies shall be licensed to do business in the state in which the Project is located.

Prior to permitting any Contractor to enter upon the Property, or any part thereof to commence any work in connection with the Project, and for the duration of the contract, Developer shall obtain, and forward promptly to Owner, copies of such Contractor's insurance.

Developer shall notify Owner of any fire or other damage to the Project and arrange for an insurance adjuster to view the Project before repairs are started, but in no event shall Developer commence any repairs, settle any losses, complete loss reports, adjust losses or endorse loss drafts without Owner's Approval, and shall promptly notify Owner of any personal injury or property damage occurring in connection with the Project.

11.  <u>Owner's Insurance</u>.  During the term of this Agreement, Owner shall carry or cause to be carried the following insurance coverages:

(i)    <u>Liability</u>.  Commercial General Liability insurance for protections against claims arising out of Owner's performance of this Agreement with limits of not less than:

(a)    Bodily Insurance and Property Damage Combined
$2,000,000

(b)    Products/Completions Operations Aggregate
$2,000,000

(c)    Personal and Advertising Injury    $1,000,000

(ii)    <u>Builder's Risk</u>.  Builder's Risk, including all existing structures in which any work or services are to be performed, as well as Project structures which are fully or partially owned or occupied by Owner or its Affiliates, for the full cost of replacement at the time of any loss subject to any deductible deemed appropriate by Owner.  This insurance shall insure against loss from the perils of fire and extended coverage, and shall include "special causes of loss" coverage, including at a minimum, coverage for theft, vandalism, malicious mischief, inland transit, collapse, debris removal, and damage resulting from defective design, workmanship or material.

(iii)    <u>Boiler and Machinery</u>.  Boiler & Machinery insurance for the entire Project and all existing structures in which any work or services are to be performed.

12.  <u>Books and Records</u>.  Developer shall keep or cause to be kept at his place of business suitable books of control and account showing all receipts, expenditures and all other records necessary or convenient with regard to the Services provided hereunder, including all

contracts and sub-contracts, and one original of each contract, occupancy lease and any other agreement relating to the Project and/or the Property. Such accounts, books and records shall be open to inspection by the Owner and their respective representatives at any reasonable time. Developer shall cooperate with the project accountants and auditors in the annual audit of books of account of the Owner and in the preparation and filing of Federal, state, city and any other income and other tax returns required by any governmental authority.

13.   <u>Indemnification</u>.  The Developer shall indemnify, defend and hold harmless the Owner from any losses, costs, claims, damages, liabilities and expenses, including reasonable attorney fees, for their respective acts or omissions, gross negligence and willful misconduct, and failure to timely perform their respective material obligations under the terms of this Agreement, while acting pursuant to the terms of this Agreement or beyond the scope of his authority under this Agreement; provided, however, that the Developer shall not indemnify the Owner for any actions undertaken by the Developer respectively pursuant to the Owner's written direction which would otherwise be outside the scope of the Developer's authority. The Owner shall not be responsible or liable for any acts or omissions of the Developer while acting pursuant to the terms of this Agreement. This Section will survive the termination of this Agreement.

14.   <u>Right to Terminate</u>.  Developer shall be deemed to be in default hereunder in the event: (i) Developer shall fail to keep, observe or perform any material covenant, agreement, term or provision of this Agreement to be kept, observed or performed by Developer and such default shall continue for a period of ten (10) days after notice thereof by Owner to Developer, which notice shall to the extent information is reasonably available to the Owner , depending on which party is providing notice, specify the nature of the default and possible cures thereof, provided that if within such ten (10) day period Developer commences curing and continues diligently to cure such failure, then Developer shall have a total of ninety (90) days in which to cure such failure;  (ii) a receiver is appointed to take possession of the assets of Developer or an assignment by Developer for the benefit of creditors, or any action taken or suffered by Developer under any insolvency, bankruptcy, reorganization, moratorium, or other debtor-relief act or statute; (iii) the death or complete disability of Developer; or (iv) upon the occurrence of any fraud, gross negligence or willful misconduct by Developer in his performance of his duties and obligations under this Agreement. Upon the occurrence of an event of default by Developer, Owner shall be entitled to terminate Developer, and upon any such termination, the Owner shall have the right to pursue any remedy they may have at law or in equity.

15.   <u>Waiver of Breach</u>.  The waiver by either party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any prior or subsequent breach by either party.

16.   <u>Attorneys' Fees</u>.  In the event of a dispute, the non-prevailing party shall pay the attorneys' fees of the prevailing party.  The prevailing party is the party who received substantially the relief sought, whether by judgment, settlement or otherwise.

17.   <u>Binding Upon Successors and Assigns</u>.  This Agreement shall inure to the benefit of and be binding upon the parties hereto, their successors and assigns. The Developers shall not assign this Agreement without the Owner's consent.

18.    <u>Governing Law</u>.    This Agreement was made in, and shall be construed in accordance with the laws of, the District of Columbia without regard to the conflict of laws provisions.

19.    <u>Notices</u>. All notices and other communications concerning this Agreement shall be in writing, and shall be delivered via certified mail, return receipt requested, or hand delivery or by overnight commercial delivery and shall be addressed as follows:

If to the Owner:

With a copy to:

If to Developer:                 5703 MANAGER, LLC
                                 Attn: William Lansing
                                 4619 41st St, 2nd Floor
                                 Washington DC 20016

With a copy to:

Any party hereto may change its address by giving written notice of such change to the other parties.  Notices shall be deemed received three (3) days after delivery by certified mail or the first business day after delivery or refusal of delivery by commercial overnight mail service.

20.    <u>Severability</u>. If any provision of this Agreement is unenforceable to any extent, the remainder of this Agreement, or application of that provision to any persons or circumstances other than those as to which it is held unenforceable, will not be affected by that unenforceability and will be enforceable to the fullest extent permitted by applicable law.

21.    <u>Entire Agreement</u>.    This Agreement constitutes the entire agreement among the parties upon the subject matter covered herein, and all prior agreements, whether written or oral, shall be of no force or effect.

**[The remainder of this page intentionally left blank. Signature pages follow.]**

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first written above.

**OWNER:**

**5703 9th, LLC**
**a District of Columbia limited liability company**

By: _____
, Member

**DEVELOPER:**

5703 MANAGER, LLC
a District of Columbia limited liability company

By: _____
William Lansing, Managing Member

## **EXHIBIT A**

FINAL PLANS AND SPECIFICATIONS

## EXHIBIT B

FINAL PROJECT BUDGET